Thank you, Your Honor. Good morning. I'm Paul George for Sherman Kemp. With the Court's permission, I'd like to save a minute of my time for rebuttal. I'd also like to thank the Court and Ms. McCartney for reaching out and making sure that the record was complete by including a video that was a subject of one of the issues that Mr. Kemp is raising. That was helpful. Let's start with that. I mean, it doesn't, if there were an enhancement for stupidity, your client would be off the charts. But what is it about the video that you find so objectionable, other than he comes across as a fairly despicable human being, but- Well, that's the point with, pardon me for interrupting. I mean, when you're showing evidence of someone's deplorable character, because let's use that term, I mean, Mr. Kemp really isn't quite as horrible as he appeared to be on that. But if he had, you know, gone out of his way to make himself look as despicable a human being as he could try to be, that's what would have been on that video. Yeah, but it was all relevant to the charge. And I understand the 404 relevance is the first threshold, then you've got a balance. But everything he says is so consistent with the kinds of evidence that the government put in. In that context, how does the 404B balance? Here's what I think is the only fair way to look at that. He wasn't charged with being a drug dealer. That was not the extent of the charge against him. He was charged with being a drug dealer in a particular context. That is, as a co-conspirator with Maurice Phillips. He was charged not with simply being a deplorable person or someone who sold cocaine, but as someone who- But he's a co-conspirator in a large-scale drug operation. Correct. That's the accusation. So that if you then just merely show that he's a drug dealer, you have not shown a necessary element of the government's case, that he was a participant in the specific conspiracy charged in the indictment. But isn't it relevant? As I read this, I thought about that old case, Red Chief, where the defendant admits to predicate offenses in order to prevent the government from introducing evidence of that. And the Supreme Court said, well, the government is permitted to prove its case, and the government doesn't have to be stuck with or limited by the stipulation. Isn't it analogous here? But this was not a stipulation, sir, that we're dealing with. I didn't get up and There was no objection to substantial additional evidence of Mr. Kemp's participation in drug selling generally and in participation in the PCO, Phillips Cocaine Organization, although it's my contention that that evidence about participation in that immediate conspiracy was much more limited than the evidence that showed that he was a drug dealer in general. We admit- And if you can show that Independent X is a drug dealer associated with Organization Y, the fact- the evidence that he's a drug dealer is still relevant- Sure. In determining whether or not he's associated with Organization Y. But if you're going to have a balance, if that means anything, one of the things you have to look at is the specific piece of evidence, how necessary is it? If you have shown to a fair be well that the guy is a drug dealer, not only through his own admissions, but through investigators who investigated the man for years, do you really need to show this when it doesn't specifically tie him in to the Phillips Cocaine Organization, but simply into the business of selling drugs? Now remember, in that video, there was not a single person in that video who was named at any point in time as being a member of the Phillips Cocaine Organization. No person who was a member of that organization was even talked about in that video. You simply had this grotesque display of, you know, loud clothing, cars, and watches, money, et cetera, and some guy, you know, acting like a jerk, and that's putting it mildly. Sure is. And so when you show this guy, you have to gauge the emotional response of a jury, particularly an Eastern District of Pennsylvania jury, to a display like that. Does it really help that jury to determine whether he's part of that PCO when there's already been ample evidence from other people that he's a drug dealer? And that's what I ask you to concentrate on. The testimony of the Baltimore police officers who said they investigated the guy for years, they knew he was a drug dealer, they chased him around town, he was ultimately arrested, he was ultimately prosecuted, the jury knew that he pled guilty to being a drug dealer. Now, when you know all that already... You said a few minutes ago there wasn't a concession to the fact that he was a drug dealer. I'm sorry, sir. There wasn't a stipulation to the fact. It was not a stipulation. But he testified. He testified and said he was a drug dealer, but well before... But the government didn't know that, obviously, that he was going to testify. No, Your Honor, but they did know that they had called the police officers to testify that he was a drug dealer. They did know from my questioning of each individual juror, because we had individuals sequestered for a year here, that we were going to tell them that he was a convicted drug dealer and, in fact, that that testimony was in front of them. All of that testimony was in front of them before this movie was ever shown. But then isn't that the Red Chief situation? I figured... Isn't that the Red Chief analogy, that the government is not stuck with that stipulation? They can still try their case. Sure, sure. But, Your Honor, my point to you is, if that balancing means anything, when you've already got so much to show that he's a drug dealer, at some point, when you show a video like that, you're going to get a conviction based on an emotional response and that there's got to be some sort of, the less you actually need it to prove the point you're trying to the more you should consider whether or not the emotional impact of the evidence was something that would sway the jury. Are you saying that, I guess the probative value would be, he discusses transport by tractor-trailer, that's the way in the PCO, the cocaine and money was transported. Your Honor, I hear you. Hold on. I'm sorry. And display of wealth, which might be consistent with somebody involved in a large-scale drug operation. But what specifically, are you saying that the prejudice is really just that he looks like a jerk? No, that he looks like, as the Chief Judge said, a despicable human being and that there's a great danger that he'll be convicted on that basis rather than upon the basis that he was a specific participant in the conspiratorial organization described in the indictment. And this whole thing about drugs coming in on trucks, anybody that thinks that the Phillips Organization is the only one that ever brought drugs onto the East Coast in trucks is kidding themselves. And as it's admitted in the government's brief on page 14, Mr. Phillips used cars to bring drugs into the Eastern District, just as surely as he used drugs, I beg your pardon, trucks. And so the Baltimore police had testified in this case and they testified that Mr. Kemp had been the subject of their investigation for years and that none of the people named in the indictment as being part of the Phillips Cocaine Organization had been uncovered as a result of their investigation of his drug activities. And that's why I say that it's so very important not to simply show that the man is a drug dealer. If that's all you can show, the correct verdict in this case is not guilty. You have to show that he's a member of the organization described in the indictment. With your permission, I'd like to address the sentencing concerns, unless you have... Go ahead. Thank you. The judge sentenced Mr. Kemp on the basis of the totality of the cocaine determined to have been distributed by the Phillips Cocaine Organization. We objected to that at the time, but the judge went ahead and ruled that the totality of that amount of drugs could be attributed to Mr. Kemp. I think that that's plainly incorrect on the evidence that we have in front of us here. And I want to particularly point to sentencing guideline 1B1.3, the application note that deals with the illustrations of how that guideline is intended to be employed. And those application notes were approved by this court in the case of USP Price 13F3-71. The application note in particular deals with a situation where someone like Mr. Phillips is distributing cocaine to two different people. Those two different people, in turn, do whatever they do with their cocaine. And it's specifically in illustration number four that somebody in that posture should only be deemed responsible for the amount of cocaine that he personally received and in turn distributed. And it's critical here because the Phillips Cocaine Organization was described in great detail in how they brought the cocaine from Texas, how they split it up and then gave it to people to sell and so forth, how they received the money back, how they counted it, how they packaged it. Mr. Kemp was never involved in any of that. He was solely someone who received cocaine from Phillips, if we believe the testimony, and in turn distributed it. And Phillips had no say over the individuals to whom he distributed it. His only obligation was to pay Phillips for what he got. And so- But that's true. Isn't there enough evidence? No, I'm asking, this is not suggesting this is true, but isn't there enough evidence to take out all the evidence, all of the drugs that Phillips dealt with somebody else, just look at the testimony as to what went to Baltimore to Kemp, don't you still get there in terms of the point? Well, that's a point that wasn't really debated before the judge who imposed the sentence because of the way he approached the sentencing. And I think that the judge did vary downward in this case. He might have varied downward even more had he determined that Mr. Kemp was responsible for a more discreet amount of cocaine. So that, yes, there's a theory under which the government could argue for the same sentence, but that's different from a determination that that's what the trial court would have done had it solely sentenced him on the basis of drugs for which he was responsible. Didn't the judge say, really, at least 150 kilograms? Yes, but it's our contention that he is referring to the totality of the drugs that were distributed. I mean, we have a situation now where Eric Holder is saying that drug sentences are too harsh and that people should petition for commutation of sentencing. It's entirely possible that in a new sentencing hearing that a less severe sentence would be sought all the way around in this case. I can't speak on that. That would be something that, you know, would have to be argued in front of Judge Joyner. But since he didn't use the correct approach to calculating the amount of drugs, it's our contention that a re-sentencing hearing would be appropriate. I see I'm well out of time here. I did want to... I want to invite you before Memorial Day weekend. No one's anxious to go anywhere. Go ahead, Mr. Evers. I want to know why you believe that we can look at your client as a wholesaler, I think you were saying, the way the brief was written, that he was not a part of the PCO. I'm happy to address that, Your Honor. I thought that I probably shouldn't, but based on the court's order. But what we're contending here is that he's no different from somebody called Kenny Jenkins in this case, whom the government called as a witness. Mr. Jenkins was somebody who received cocaine from Maurice Phillips, and in turn distributed however he saw fit. And he, however, had a sexual relationship with one of Mr. Phillips' closest associates, Miss Cunningham. Kemp wasn't like that. All he was... I analogize him to someone who, in the legal business world, owns a lumberyard. He gets lumber for some giant corporation. He brings it into his shop. Then somebody comes around to him and buys it because he intends to do a job for someone whose home needs repairs. In turn, someone whose home needs repairs pays this individual contractor. All of these people have a business relationship, but they are not members of a conspiracy. They are not people who are part of the same organization. Now, that was argued in summation, was it not? Yes, that's argued. So the jury rejected that construction, or that characterization? They rejected it, yes. But I maintain that on the evidence, all that we had here was the buyer-seller relationship, as it's described in the cases that I cited. What about the way Kemp came to his position to be the Baltimore distributor, if I can characterize it that way? And then the evidence about the time when Phillips decided to deal directly with Kemp. He didn't want to initially because he thought Kemp was too flashy. Yeah, he maybe saw the movie, I... Maybe, I was just going to say, exactly right, exactly right. One of the new parts of that guy. But for better or for worse, he decided, well, you know, he's still my guy, I'll go with him. And so Kemp then steps into the shoes of these two other guys who are in prison. There's also evidence about fumbling, if you call it hush money, whatever you want to call it, maybe a breaking bad where the money's flowing into the guys in prison to make sure that they're supplied with income while they're behind bars so they won't get loose lips. All that, doesn't that more than, isn't that more than enough to suggest the necessary relationship between Kemp and Phillips? It suggests a relationship between Kemp and the people who used to be the buyers from Phillips, but I don't think that it makes him into something other with respect to Phillips than a buyer. That would be our position, that, you know, clearly there's a line of demarcation somewhere between the 19-year-old young man who's selling drugs on the corner in Philadelphia right now and whoever's the head of Sinaloa cartel in Mexico. I mean, somewhere along the line, these people are all profiting from the same distribution of the same product. It's all passing through all of their hands, but we would all agree they're not part of the same conspiracy. And at some point, there's a dividing line. And I think that if you've got somebody who's buying from one person and then turning around and selling to whoever he wants and his obligation to the individual from whom he bought is solely to pay the price, then you're not dealing with someone in the same gang. That's our contention. Thank you. And I don't know if I used up my rebuttal time. Okay, thanks. You didn't use it up, but you'll get your turn. Thank you, Your Honor. If I may. Sure. Your Honor, if I may start at the end. Why don't you, for the record, tell us who you are. May it please the court, L.C. Wright for the government. Good morning, Your Honor. Good morning. Thank you, Your Honor. You're the trial attorney here, right? Yes, sir. Both. Well, not alone. My co-counsel is seated here, Maureen McCartney. We tried it together. Why is she hiding back there with Zosima? That's what I was asking. I actually wanted them both here, Your Honor, or even here for that matter. If I may. She's still not safe. We could call her. That's true. Maybe we'll call Zosima and see what he has to say. I just recently found out his nickname is The Answer. If I may start at the end of Mr. George's argument with regard to the evidence that Mr. Kemp was a member of the PCO. There was direct evidence of that from members of the PCO. And that's something that wasn't mentioned and is discounted because he makes credibility arguments with regard to the witnesses who testified that Mr. Kemp was in the PCO, that he was part of the organization. Which members testified? Mark Harris, Chanel Cunningham, Lamont Smith. They all testified that he was a member of the organization and they went into great depth about how that came about. I don't use the word member. I mean, Chanel Cunningham talks about a few, what is it, five or six times the money came to her. Well, she talks about that. She talks about when the organization got together and decided to have social events, how Mr. Kemp, in fact, was one of the individuals who organized the social events. At least one of the social events. And in that regard, he provided 50 bottles of Cristal champagne at $200 a bottle. And he, in fact, she was told by Mr. Phillips about Mr. Kemp's role in the conspiracy. She, in fact, said that Mr. Phillips told her that he was now dealing directly with Mr. Kemp. And she did that. And I suggest to the court that Mr. Phillips did that because Ms. Cunningham was going to be receiving large amounts of money. And she received large amounts of money repeatedly from Mr. Kemp in Maryland and from Anthony Ballard. And both of those individuals were members of the conspiracy. They were members of the organization. Was Cunningham the one with the stash house?  Was Cunningham the one with the stash house? No, that's Sharon Drake, who's an individual who was working under Mr. Kemp. On behalf of all that, going back to Mr. George's point, why are you sleazing with the video? Well, Your Honor, this was a lengthy trial. It was a three-month trial. And every point was contested. Four months was jury instruction. Every point was contested. It was a fight from the beginning to the end. Mr. George repeatedly argued that his client was not a member of the conspiracy. He said that he was a drug dealer, but not a member of the conspiracy. The date of the video makes a difference here. The video was produced in 2004. Now, Mr. Kemp was a drug dealer, and he was a convicted drug dealer. He became a convicted drug dealer. Mr. Kemp is right in that regard. But the conspiracy that he, Mr. George is right in that regard. But the conspiracy that he was convicted of took place in 2007. And he left the Phillips cocaine organization in 2005. So in 2004, when he was talking about his $100,000 watch, when he was talking about, when he was pulling money out of his pockets, large amounts, prodigious amounts of money out of his pockets. And I'd like the Court to keep in mind that he didn't report any taxes that year in 2004. There was evidence as to that. And it was the government's contention that the... He's not charged with a tax evasion. No, he's not charged with a tax evasion. Well, that was relevant, Your Honor, in order to show the source of his income. And we were entitled to that inference. If he has all of this money, and if he has a $100,000 watch, as he claimed, that the source of that was his drug trafficking. And moreover, he talked specifically about... But George is saying he admitted all that. Well, yeah, but his drug trafficking for the Phillips cocaine organization. Because from 1998 through 2005, Mr. Kemp served one master. And that was the Phillips cocaine organization. That didn't change until afterwards. Until 2000, and he left the organization sometime in 2005, was the evidence. Late 2000, very, very end of December of 2004 going into 2005, was the evidence. So from 1998 through 2004, all the way through 2004, he had one organization that he was working for. And that organization was the Phillips cocaine organization. What was the date again of the video? Pardon me? What was the date again of the video? In 2004, Your Honor. Where did it come from? It's commercially available. I Googled it. I couldn't find it. Well, they can find it in Baltimore now. It's commercially available. You may have had to go to some of the avenues. I have a tailor on Eastern Avenue. You could find it probably there. Is this like a DVD that's out there? It's a DVD, Your Honor. And the fact that it was commercially available, Your Honor, is in fact important in a sense because it had a title. And the title was Stop Snitching. And it may have been Stop F-ing Snitching. And it was very controversial. And it was very controversial in Baltimore City. But when the district court performed a balancing act in order to make a determination whether the danger of unfair prejudice was substantially outweighed the probative value, it in fact said, well, no, you can't talk about the name of the video. Name of the what, I'm sorry? The name of the video. It said, you can't talk about it being named Stop Snitching. And I suggest to the court that the video was indeed very, very, very probative. Prove? Give us. What did it prove? Well, Your Honor, it in fact proved, number one, that he had income, a lot of income. And that income in fact came from the organization because that's who he was working for at the time. Maybe that's a jump though because George is saying, Mr. George is saying that he had income and he was a drug dealer. Yeah, but the jury rejected Mr. George's position with regard to him being a member of the organization. And that's what the evidence was. From 1998 to 2004, he served one organization. And that organization was the Phillips Cocaine Organization. So yes, he was a drug dealer. But when he was pulling out those wads of money and had the $100,000 watch, he was a drug dealer for the Phillips Cocaine Organization. And that was the source of his income. Number two, with regard to the methods, he says in the video that he took the, that your money wasn't any good unless it was wrapped in rubber bands and going south or west. Right, going south or west. And that meant going south was going down into Texas to pay for the cocaine. Going west, pay cocaine, pay for the pay. And that's what the Phillips Organization did. They used tractor-trailers not only to get drugs back up. There was a time after the trucks stopped and there was a $400,000 seizure, they started trying to go to cars. But they, for the most part, used tractor-trailers to send the money down. And they bring drugs up. I suggested that to him as well. He pointed out, well, a lot of businesses do business with a tractor-trailer. That's true, Your Honor. Why is that so probative here then? Well, Your Honor, it's probative here also because of the way that Mr. Phillips reacted to it. Because Mr. Phillips was incensed at the video. He was incensed and he told a co-conspirator, who in fact testified to the jury, something to the effect, and if you'll excuse my language, that stupid MF, that stupid MF is going to get us all. Look, he's talking about what we actually do. I knew I shouldn't deal with those young cats. Something to that effect. And so he, in fact, was incensed because he knew what the jury determined, beyond a reasonable doubt, that during the time frame that that video was made, that Mr. Kemp, in fact, worked for the Phillips cocaine organization. Was there a limiting charge given or requested about the use of that video? I don't recall whether there was a limiting charge given, but I will say this, if one had been requested, it would have been given. You would have conceded to it, is that what you're saying? Certainly we would have conceded to it. What kind of limiting instruction would you have thought reasonable or appropriate? That, in fact, it depicts a lifestyle that may, and you can't hold his lifestyle against him, and that you should make a decision based on the evidence. But I suggested to this court, respectfully, but that's what the jury did. You know, I think we have to give jurors more credit. I understand that some people may find the video offensive. But if you look on MTV, if you look on VHS. MTV is blocked on all the televisions in our house for that reason. Unless you know the four-digit code, you can't look on MTV. Well, in those households, Your Honor, where the televisions aren't blocked, you see this as a matter of course. If you have satellite radio, I was riding with my kid who has a learner's permit, one of my three sons has a learner's permit, and the music was on, and I said, wait a minute. We have to, you know, I don't want to hear this necessarily. But this is something that is commonplace now, and I think that we don't give jurors enough credit if we, in fact, say that you will not be able to make a determination. You won't be able to discern between what you may consider offensive lifestyle or behavior and whether he is, in fact, a member of a narcotics trafficking organization. It wasn't the fact that he was talking about women. It wasn't the fact that he demonstrated an attraction towards women, obviously, and thought a lot of himself in that regard that necessarily went to his drug trafficking. It was what he said in it, and it was the reaction and the timing of it, which was 2004, and the reaction of the person who he worked for and who the evidence showed that he had worked for from 1998, actually, because when Stanley Wagner, when Julius Wagner, all those know Stanley Wagner and Anthony Ballard were in Baltimore, he was working directly for them as part of the organization, and they were working directly for Maurice Phillips. And I suggest, and, Your Honor, it simply wasn't unfairly prejudicial, and the district court, using an abuse of discretion standard, in fact, sat and he listened to it and he saw all of the evidence in relationship to it and made a determination, and I believe that it was the correct determination that it was not unfairly prejudicial. And when you look at unfair prejudice, of course, it's a type of prejudice that deflects the jury's attention away from the central issues of the case and convinces them to convict on some other grounds. In this case, it cut directly to the central issues of the case. His source of income in 2004 and the reactions of, and his membership in that conspiracy as not only demonstrated by what he showed in the video, and his statements in the video, but also by the reaction to the video by the person who he was working for who was afraid, and I think this was articulated in the record, that he's going to bring heat down on the organization because he was a member of the organization. Did the jury hear the name of the video? No. Okay. No. When the court did the balancing act, the 403 balancing act, to make a determination as to whether it was substantially, whether it's danger of unfair prejudice, whether the probative value was substantially outweighed by the danger of unfair, not just prejudice, the danger of unfair prejudice, he said, you don't need the title, government. Okay. You don't need the title. And so he, in fact, cut that out. But the jury looked at the totality of the circumstances in the evidence. This was not one thing that they said, oh, my God, there were 12 of them there. You know, oh, my God, we're going to convict him because he made a mistake. He was a despicable human being. Yeah, right. And, frankly, Your Honor, excuse me for saying this and voicing a personal opinion, you know, was he despicable? I don't know if he was despicable. That's just his lifestyle, and that's the way he reacted to things. I don't necessarily agree with it, but it did not, that's not what got him convicted. His lifestyle wasn't what got him convicted. It was what he said and what he did as part of this conspiracy, and it was the evidence of which this was part that led to his conviction in this case, Your Honor. What about the argument Mr. George makes about the attribution of the drugs? Your Honor, that's a remarkable argument. He's a remarkable lawyer. It's a remarkable argument because in 2000, 1990, from 2000 to 2002, Mr. After Anthony Ballard and Julius Wagner, who were the distributors for whom Mr. Kemp worked, or he worked through, because he actually worked for Mr. Phillips then, too, and Mr. Phillips said, look, I want a buffer. And Mark Harris, you're that buffer.  It's in a different part. He was distributing more in the D.C. area and more in the D.C. area. He provided them with four to five kilograms, was it each week? Every other week for two years, and even if you take four kilograms, that's over 200 kilograms there. And then there were tens of thousands of dollars later on in the conspiracy, while he was still a member, that he was remitting to Chanel Cunningham, who was in the organization, to give to Mr. Phillips. There were other deliveries that were made. Lamont Smith, in fact, testified that Mr. Phillips told him, look, we're dry down in Maryland. I want you to give 30 of the keys that I gave you to distribute in the Philadelphia area to Sam McQueen. Sam McQueen was the old man, old head, the grand pop, they called him, to take down the Maryland for Kemp and for Harris. And that was 30 keys. He split it in half. It's 15 keys. Samuel McQueen, who only dealt with people, who only made deliveries to people who were in the organization, Samuel McQueen, in fact, took drugs to Mr. Kemp. He went to Mr. Harris, and he said, and Harris was, Mark Harris was like, hey, my load is light. What's going on? And Mr. McQueen said, well, you know, Moe told me to give these 10 keys to Goose, who was Mr. Kemp's, one of Mr. Kemp's nicknames. And that, again, that's another 10 keys. That's 25 more keys on top of the couple of hundred keys. And to say that it wasn't foreseeable when, in fact, Mr., when you talk about, and so we're well over the 150-key threshold right there just with regard to Mr. Kemp. But then when you talk about foreseeability, oh, my goodness. I mean, he went to, he knew what the organization was doing. That doesn't take into account the keys that were distributed through Anthony Ballard and Julius Wagner prior to them being incarcerated, which occasioned Mr. Phillips dealing directly with Mr. Kemp. How long were they distributing? What is the evidence? How long were they distributing before they were locked up? At least a couple of years, 1998 or so. And that's when Kemp stepped in and directly? That's when Kemp, right. When they went to prison, then Mr. Phillips said, I don't want to deal with Kemp directly. He's a young cat. He's too flashy. He's going to get us in trouble. Maybe I can put a buffer in the organization between us, you know, distributors. So Mark Harris, you do it. And, you know, it was unwieldy for Mr. It was unwieldy for Mr. Phillips because he wasn't, you know, you're going through your distributor who you actually want to distribute cocaine somewhere else. He says, I'm losing money. Okay, I'll deal with you directly. And so, but there was a couple of years where, of course, he was dealing, he was talking to, or not talking to, but he was working directly for Stanley Wagner, Julius Stanley Wagner and Anthony Bowderin. And, in fact, he talks to Mark Harris about that at one point, where they're discussing, because they have a discussion at one point about a batch of what was called lion's head cocaine that was a bad batch. And so they were on the phone, and they were commiserating about how bad the batch of cocaine was. And Mr. Kemp says to Mr. Harris, yeah, but we'll go back to Moe. You know, look, we have to talk to Moe about this. You know, we've got to kick this stuff back, so on and so forth. And then Kemp says, you know, when Stanley and Bowderin were out, and Anthony were out, they called him buzzard. Now, I'm not sure whether he was talking about one or both of them at the time. But when they were out, you know, the model was everything must go. And so he was well aware of the scope of the organization. He knew what Harris was doing. He knew what Lamont Smith was doing. He knew what Chanel Cunningham was doing. He was involved in the social events that brought a cohesiveness to the organization. And he knew it was a multimillion-dollar enterprise. And I'm being conservative when I say tens of millions of dollars. This drug trafficking organization was remarkable in not only its scope, its breadth, its size, and its longevity. Unless there's something else the court would like to hear, I'm more than happy to answer anything that I can. I thought Ms. Osmer was the answer. She still is, Your Honor. I'll answer to him after I step down from. Thank you. Thank you. Mr. George? It is an uphill swim, isn't it? It is kind of an uphill swim, isn't it? I'd like to make a few points. Certainly there is a question about the movie. What was it originally? It wasn't made by Mr. Kemp. Somebody else made the movie. He went all around Baltimore filming people bragging about drug dealing. Carmelo Anthony. The production values are amazingly low. Carmelo Anthony is actually in the video at one point, standing with a bunch of drug dealers he apparently knew from the neighborhood. Carmelo Anthony is in one of those clips? Not that you saw, but in the full hour and a half of nonsense that's contained in the video, he appears at one point. It certainly wasn't Mr. Kemp who was the director or gave it a name or filmed these other people. In addition, I'd like to just comment that attending a social event with other people that are in the same business as you are in does not make you part of their organization. That's well taken and that's understood. That's really your argument. What you're doing is taking a shot at each individual piece of evidence and saying that does not establish the government's case. That's true, but that's not the way the evidence comes in. The government has a right to put it in. They have to put it in piece by piece by piece. They pull it back and then argue to the jury that all those things taken together when you apply your common sense to it establish beyond a reasonable doubt that the charges here have been made out. It seems to me, and maybe tell me why I'm wrong, why even though the video would not in and of itself take out the government's point, even though taking 50 bottles of $200 champagne to a party in New York with Phillips' folks doesn't in and of itself make out the point, instead of taking all those things together and you start getting a fabric that starts to be woven which would support the government's case. I honestly disagree with that. I think that you start to get a picture of Mr. Kemp as someone who gets his cocaine from Mr. Phillips. That much I concede. Whether that makes him something other than a buyer. What about the conversations that Mr. Wright just referenced with Harrison and Phillips and some of the other co-conspirators? I acknowledge that you have situations here where one person that didn't testify said something to someone else that didn't testify and then that person that didn't testify said something allegedly to Mark Harris and Mark Harris repeated that in court. But that's a jury argument. That's an argument. It's not reliable evidence. But as long as it's admissible... But I suggest to you that the very fact that there's so many buffers between Mr. Phillips and Mr. Kemp is evidence that Mr. Kemp was nothing but a buyer. You put all these barriers between you because you don't want this guy to be part of the inner circle that makes decisions as to what cocaine to buy, how to bring it to the East Coast, how to repackage it, how to distribute it, how to take the money, what to do with the money. His managerial role is different from whether or not there was an agreement. When you say buffers, did you see Godbrother 2? Because there were a lot of buffers. The fact that there were a lot of buffers does not negate the fact that the people in the organization knew what was going on. Well, I leave it to you to review the evidence and draw the conclusion that's appropriate to the court. But if there's anything, if there is any validity to the distinction drawn by this court and by other courts between members of a conspiracy and between buyer-seller relationships, I think all the evidence shows here that at arm's length, just the way people in the legal business world deal with each other, Mr. Phillips dealt with Mr. Kemp. I'm going to sell you my product if you can pay for it. What was your argument against the enhancement for your clients being a managing member? Not enough people under him were shown? No, that the person under him simply worked for him. She had no idea who Maurice Phillips was. Are you talking about Drake? Yes, Sharon Drake. Sharon Drake was just somebody that let Mr. Kemp keep his drugs in her basement. She had no idea where the drugs came from. Did the government, and I guess I should have really asked Mr. Reithes, who were the people that the government said were managed by your client? Sharon Drake is the only person that I understand that they... And your client got three points enhancement? Yes, and none of those people in the video, I remind you, had anything to do with Phillips' cocaine organization. They were all drug dealers, and none of them had anything to do, and none of their names were ever mentioned at any point in time during the trial. The sole person that he was asserted to have managed is Ms. Drake, and as the Baltimore police testified, this guy's drugs came from multiple sources, and there's no indication that the drugs that were in the basement at the time as Ms. Drake got into trouble came from the Phillips organization. I could go on forever, and I'm sure you don't want me to do that. If you have additional questions, I'd be delighted. Thank you very much, Your Honor. Thank you. Thank you. That was a very helpful argument. Mr. George, Mr. Reithes, thank you very much.